**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF LYVITA GOMES, | ) | |
| Deceased, by Alfredo Miranda, | ) | |
| Administrator, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| vs. | ) | |
| | ) | Judge |
| COUNTY OF LAKE, SHERIFF MARK | ) | |
| CURRAN, CORRECTIONS CHIEF | ) | Magistrate Judge |
| WAYNE HUNTER, HEALTH | ) | |
| SERVICES ADMINISTRATOR SCOTT | ) | |
| FITCH; CORRECT CARE SOLUTIONS, | ) | |
| DR. ROZEL ELAZEGUI, and DR. | ) | |
| HARGURMUKH P. SINGH, | ) | JURY DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Lyvita Gomes was a 52 year old woman, a citizen of India, who died on January 3, 2012 after 15 days in custody at the Lake County Jail, in the hands of employees of the Lake County Sheriff's Department and Correct Care Solutions. This is a civil rights and wrongful death action seeking monetary damages on behalf of the Estate of Lyvita Gomes and her heirs. Defendants were aware throughout her detention that Ms. Gomes was in need of medical and mental health treatment, and their deliberate indifference to her serious medical needs resulted in her death.

## JURISDICTION AND VENUE

1. The jurisdiction of the Court is invoked pursuant to the Constitution of the United States, the Civil Rights Act, 42 U.S.C. §1983; 42 U.S.C. §12131(the "Americans with Disabilities Act"); 29 U.S.C. §794; the Judicial Code, 28 U.S.C. §§1331 and 1343(a); International Law: the

1

Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261; and supplementary jurisdiction, as codified in 28 U.S.C. §1367(a).

## PARTIES

2.  Plaintiff Alfredo Miranda is a resident of the State of Illinois and was duly appointed by the Circuit Court of Lake County to serve as independent administrator and representative of the Estate of Lyvita Gomes, deceased.

3.  At all relevant times, Defendant Mark Curran was the duly elected sheriff of Lake County and chief administrator of the Lake County Jail [LCJ].  At all relevant times, he was acting under color of law and in the course and scope of his employment as the agent, servant, and an official policy maker for Defendant Lake County on issues relating to care of prisoners in LCJ and the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit, and as the County's chief law enforcement officer. Defendant Curran was the commanding officer of all Lake County sheriff's deputies, correctional officers, and jail employees, and he was responsible for their training, supervision, and conduct. He is sued in his official and individual capacities.

4.  At all relevant times Defendant Wayne Hunter was the chief of corrections in charge of the Lake County Jail and was employed by the Defendant County of Lake and/or Defendant Lake County Sheriff. Defendant Hunter was also responsible for the implementation of the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit.  At all relevant times, Defendant Hunter was acting under color of law and in the course and scope of his employment. He is sued in his individual capacity.

5.  Defendant Scott Fitch is the Health Services Administrator employed by the Defendant County of Lake and/or Defendant Lake County Sheriff, who, at all times material to this Complaint, was engaged in the conduct complained of in the course and scope of his employment and acted under color of law. He is sued in his individual capacity.[1]

6.  Defendant Correct Care Solutions, LLC, hereinafter CCS, with home offices in Tennessee, is a Kansas corporation which at all times material to this Complaint had a contract with Lake County to provide medical and mental health care to those detained at Lake County Jail. Defendant CCS was responsible for providing all medical services to detainees, including but not limited to assessment of need for services, provision of care and treatment services for all health care needs and follow up; and for hiring, training, supervision and conduct of all health care providers at the jail. At all relevant times, CCS, by and through its employees and agents, was acting under color of law and its agents and employees were acting in the course and scope of their employment.

7.  Defendant CCS was responsible for the establishment and implementation of the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit.

8.  Defendants Dr. Rozel Elazegui and Dr. Hargurmukh P. Singh were at all times relevant to this Complaint health care providers employed or contracted by CCS to carry out the CCS contract with Defendant Lake County, and were engaged in the conduct complained of under color of law and in the course and scope of their employment. They are sued in their individual

---

[1]The "Lake County Defendants" or the "LCJ Defendants" include Defendants Lake County, Curran, Hunter, and Fitch.

capacities.[2]

9. Defendant Lake County is a governmental entity within the State of Illinois which funds and operates the Lake County Jail and even if Defendant Sheriff Curran may be the actual employer of Defendants Hunter and Fitch, Defendant Lake County is a necessary party and is ultimately responsible for a judgment or settlement.

10. Defendants Lake County and/or Sheriff Curran are responsible for the establishment and implementation of the policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit.

11. Defendants Lake County and/or Sheriff Curran are also responsible for ensuring that all of its facilities, including the Lake County Jail, are in compliance with federal and state law, department or agency policies, rules, and regulations, and related standards of care.

12. Defendants Lake County and/or Sheriff Curran are public entities within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. 12131(1).

## FACTUAL ALLEGATIONS

### A. Lyvita Gomes in custody

13. On October 12, 2011, a Lake County Sheriff's deputy went to Lyvita Gomes' home to arrest her on a warrant issued when she failed to appear for jury duty, for which she was not eligible as she was not a citizen of the United States. She told the deputy that she thought she had taken care of the matter with a phone call, and told him several times that she was ill and could not go to jail. The deputy nevertheless took her into custody, and charged her with resisting arrest for allegedly pulling her hand away from him as he handcuffed her behind her back.

---

[2]The "CCS Defendants" include Defendants CCS, Dr. Elazegui, and Dr. Singh.

14. Ms. Gomes was delivered to Lake County Jail on a $50,000 bond, where LCJ and CCS staff knew immediately and documented that she had a serious need for mental health treatment, and placed her on suicide watch based on statements she made during the intake process. She was removed from suicide watch on October 14 to be handed over to Immigration and Customs Enforcement [ICE], allegedly because her visa had expired. ICE processed and released her.

15. On December 14, 2011, Vernon Hills police arrested Ms. Gomes at her home, on a warrant for failing to appear in court on the previous arrest, for which bond had been set at $20,000. They delivered her to the same Lake County Jail where she had been placed on suicide watch only two months earlier, and where again LCJ and CCS staff knew immediately and documented that she had a serious need for mental health treatment.

## B. Lyvita Gomes not eating or drinking;
### grave consequences and death

16. The LCJ and CCS defendants knew that Ms. Gomes declared on December 14 that she would not consume any food or liquid so long as she was in custody.

17. In court the following day Ms. Gomes' bond was set at $5,000 and she was returned to Lake County Jail after she failed to post the $500 required for release.

18. On December 16, the CCS social worker who conducted the initial mental health screening knew that Ms. Gomes was not eating and had said she would not eat until she was released. At the time she weighed 146 pounds.

19. On December 17, Ms. Gomes was moved to the medical pod, where the LCJ and CCS defendants stood by as she withered away before their very eyes as they documented her weight loss — down to 128 by December 28 —; documented her refusal to take food and drink; and

5

officially noted her consistent refusal to talk to medical staff, allow them to take her vital signs, or perform necessary laboratory work.

20. On December 20, when Ms. Gomes appeared in court, the judge ordered a mental fitness evaluation to determine her fitness to stand trial, with the report to be provided by January 5. The LCJ and CCS Defendants were aware of this order and knew that this order did not relieve them of their duty to provide Ms. Gomes with the care she needed.

21. The LCJ and CCS Defendants knew that they did not have the ability at LCJ to administer the medical and mental health care that Ms. Gomes needed. For example, they knew that at the jail they could not provide her with intravenous fluids to keep her hydrated, while they also knew that telling her to eat and drink and prescribing extra juices was wholly ineffective in keeping her hydrated or other otherwise preventing her condition from deteriorating.

22. The LCJ and CCS Defendants did not arrange for Ms. Gomes to be seen by a physician until December 22 — a day the physician was routinely scheduled to see patients at the jail —, after she had not eaten or drunk anything for a full week. When Defendant Elazegui saw her on this date the only thing she would tell him was that she wanted to buy her own food from the outside, "what I usually do." Defendant Elazegui took no steps to ensure her safety, in spite of his knowledge of her serious medical and mental health needs, which were documented and which she demonstrated on December 22, including that she had not eaten or drunk anything since December 14.

23. Between December 22 and December 27, CCS medical staff repeatedly informed Defendant Elazegui of Ms. Gomes' ongoing refusal to consume food or drink, her ongoing refusal to submit to laboratory testing, and her worsening condition.

24. Defendants did not arrange for Ms. Gomes to be seen by a psychiatrist until December 24 — a day the psychiatrist was routinely scheduled to see patients at the jail —, after she had not eaten or drunk anything for ten days.

25.  When defendant Singh saw Ms. Gomes on December 24, she refused to speak with him. He determined that she was psychotic, but took no steps to ensure her safety, in spite of his knowledge of the serious medical and mental health needs which were documented for the previous ten days and which she demonstrated on December 24, including that she had not eaten or drunk anything since December 14.

26. On December 24, Defendant psychiatrist Dr. Hargurmukh P. Singh diagnosed Ms. Gomes as suffering from psychosis.  Despite this diagnosis, neither Defendant Elazegui nor Defendant Singh, nor any other defendant took adequate steps to ensure her safety.

27. During her incarceration in LCJ Ms. Gomes consistently and repeatedly refused to communicate with medical and corrections personnel, refused to allow evaluation, laboratory tests, or examinations, and often shut her eyes and failed to respond in any manner to persons who were attempting to communicate with her.

28. On December 27, Defendant Elazegui, recording that it was the 13th day of Ms. Gomes' hunger strike, saw her at the jail, and she refused to speak with him. He noted that she was "medically stable," in spite of the fact that he had inadequate evidence to arrive at this conclusion, given her refusal to communicate and to allow evaluation, laboratory tests, or examinations. He failed to take adequate steps to ensure her safety, in spite of his knowledge of the serious medical and mental health needs which were documented for the previous 13 days and which she demonstrated on December 27.

7

29. Defendant Singh returned to see Ms. Gomes on December 27 — a day the psychiatrist was routinely scheduled to see patients at the jail — and again determined she was psychotic, this time noting that she was in an obvious psychotic state, and noting that she was clinically incompetent to make judgments about her own health and life, and likely to jeopardize her physical well being by her actions. He failed to take adequate steps to ensure her safety, in spite of his knowledge of the serious medical and mental health needs which were documented for the previous 13 days and which she demonstrated on December 27, including that she had not eaten or drunk anything since December 14.

30. All Defendants knew that a hunger strike could be life threatening and that refusal to consume both food and drink could be fatal in just a few days.

31. On December 29, after the Defendants allowed Ms. Gomes to become so severely dehydrated that her kidneys failed, another physician ordered that she be taken to a hospital emergency room.

32. At the same time, on the orders of the Lake County Defendants, a Lake County officer went to court to obtain an order granting Ms. Gomes a bond which did not require her to post any money, hoping thus to avoid the responsibility for paying her hospital bill.

33. On January 3, Ms. Gomes died in the hospital as a result of the Defendants' deliberately indifferent failures and refusals to provide her with the care she needed while in their custody.

34. The Lake County Defendants were on notice that the medical attention being provided by CCS was inadequate to meet Ms. Gomes' serious medical and mental health needs, including as evidenced by the following:

    a. the medical pod where Ms. Gomes was detained was a small unit with two cells with

glass windows in the doors and/or walls, where corrections officers had the ability and the duty to observe her in uninterrupted fashion 24 hours a day, and to monitor the activity in and around her cell, including when medical staff attended her;

b. Lake County officers were present along with CCS medical staff every time CCS attended Ms. Gomes;

c. the LCJ hunger strike plan required officers to report hunger strikes to commanding officers;

d. the LCJ hunger strike plan required Defendant Fitch to confer with Defendant Hunter or his deputy about all hunger strikes;

e. the CCS hunger strike plan required officers to document the hunger strike in the inmate's LCJ record;

f. the CCS hunger strike plan required the CCS health services administrator to keep the LCJ administration, that is, the LCJ Defendants, fully informed of any hunger strike;

g. the CCS hunger strike plan required that during a hunger strike, health care and corrections staff must maintain regular communication;

h. from December 18 through December 29, LCJ officers recorded on a form entitled "15 Minute Inmate Suicide Watch" Ms. Gomes' activity — or lack thereof — every 15 minutes, such as that she was laying on her bed or appeared to be asleep;

i. on December 18 and December 23, a LCJ officer recorded on a form entitled "Inmate Alert/Suicide Assessment," first, that Ms. Gomes had mental health issues, that medical staff informed him Ms. Gomes had not eaten since December 13 [sic] and was purposely not eating, and that she was to be placed on suicide watch; and later that Ms. Gomes refused medical

9

treatment and would not communicate or comply with medical staff.

j. from December 18 through December 28, with some exceptions, CCS personnel recorded, initially on a form entitled "Self Harm Watch/MH Obs Initial Assessment" that Ms. Gomes said she would not eat until she left jail, and that her last known meal was on December 14; and thereafter on a daily basis on a form entitled "Self Harm Watch/MH Observation Follow-up Note," that she refused to talk, and that there was harm since the previous assessment, in that she had still not eaten, often noting that she hadn't eaten since December 14, sometimes noting she was encouraged to eat, repeatedly requiring nothing more than an ongoing "daily watch;"

k. from December 16 to December 29, with some exceptions, CCS Defendants recorded on a form entitled "Medical Services Food and Vital Sign Monitoring Hunger Strike" Ms. Gomes' weight drop from 146 pounds to 128 pounds, blood pressure and pulse when she permitted them to get these vital signs; her refusal to consent to other laboratory testing or examinations; and her refusal to take food or drink;

l. from December 20 to December 29, with some exceptions, CCS Defendants recorded on a form entitled "Refusal of Treatment" that Ms. Gomes not only refused food and water and refused to be examined, assessed, and have her vital signs taken, but that she was warned about the potential consequences of worsening medical conditions and death, and that she refused to sign the refusal form;

m. the Lake County Defendants knew, over the 15 days Ms. Gomes was in their custody, that any purported treatment provided by CCS was not effective, and they knew that she was losing weight and becoming increasingly lethargic and incommunicative;

n. the Lake County Defendants were never advised that CCS personnel were effectively

treating Ms. Gomes.

35. The CCS Defendants knew that Ms. Gomes had serious medical and mental health needs, including as evidenced by the following:

a. LCJ officers regularly spoke with CCS Defendants and other CCS providers about Ms. Gomes' condition and the fact that she was not eating or drinking;

b. the CCS hunger strike plan required that during a hunger strike, jail and health care staff must maintain regular communication;

c. from December 18 through December 28, with some exceptions, CCS personnel recorded, initially on a form entitled "Self Harm Watch/MH Obs Initial Assessment" that Ms. Gomes said she would not eat until she left jail, and that her last known meal was on December 14; and thereafter on a daily basis on a form entitled "Self Harm Watch/MH Observation Follow-up Note," that she refused to talk, and that there was harm since the previous assessment, in that she had still not eaten, often noting that she hadn't eaten since December 14, sometimes noting she was encouraged to eat, repeatedly requiring nothing more than an ongoing "daily watch;"

d. from December 16 to December 29, with some exceptions, CCS Defendants recorded on a form entitled "Medical Services Food and Vital Sign Monitoring Hunger Strike" Ms. Gomes' weight drop from 146 pounds to 128 pounds, blood pressure and pulse when she permitted them to get these vital signs; her refusal to consent to other examination; and her refusal to take food or drink;

e. from December 20 to December 29, with some exceptions, CCS Defendants recorded on a form entitled "Refusal of Treatment" that Ms. Gomes not only refused food and water and refused to be examined, assessed, and have her vital signs taken, but that she was warned about

11

the potential consequences of worsening medical conditions and death, and that she refused to sign the refusal form;

     f. Defendants Elazegui and Singh personally witnessed Ms. Gomes' condition, as more fully described above.

36. CCS Defendants knew at the time they saw Ms. Gomes that she had serious medical and mental health care needs.

37. CCS Defendants knew at the time they saw Ms. Gomes that if they did not provide appropriate and effective care, Ms. Gomes could die or her physical and mental health could worsen.

38. All Defendants knew that Ms. Gomes, as an inmate in LCJ custody, had no other treatment options, and that if they (LCJ and CCS) failed to provide adequate treatment, she could access no other treatment.

### C. The Contract Between Lake County and Correct Care Solutions

39. On November 26, 2008, Defendant Lake County entered into a contract with Defendant CCS that granted CCS the exclusive right to provide medical and mental health services to inmates at Lake County Jail for a period of two years commencing on December 1, 2008. For the first year under this contract, Defendant Lake County would pay CCS an annual amount of $2,163,650, assuming an average daily inmate population of 700.

40. On August 25, 2011, Defendant Lake County renewed its contract with Defendant CCS to cover the period of December 1, 2011 to November 30, 2012. Under this contract, Defendant Lake County would pay CCS an annual amount of $2,319,003.40.

41. The contract provided that in the event the actual costs exceeded or fell below the budgeted costs, the Lake County and CCS Defendants would split the difference, each paying or receiving half the difference. The contract also provided for regular meetings between the Lake County and CCS Defendants to discuss disparities between budgeted and actual costs.

42. The cost of providing treatment for an inmate in the jail, with nursing, mental health, physician and psychiatrist staffing already included in the budget, is lower than the cost of providing the inmate treatment in hospital.

43. Any expenditure of funds for an inmate requiring medical services in hospital would reduce annual profits for the CCS Defendants and would increase expenditures for the Lake County Defendants, and the consideration of profit and expenditures influenced the Defendants' decisions about what treatment to afford Ms. Gomes.

44. The cost of providing treatment for Ms. Gomes in hospital amounted to over $66,000.

### D. Lake County Jail and CCS Hunger Strike Plans

45. The Lake County Defendants knew that hunger strikes could affect the health and life of inmates, as evidenced by their written plan for addressing hunger strikes in effect at the time Ms. Gomes was in custody, which provided that medical staff must be notified when an inmate is on hunger strike, and that the jail's health services administrator must confer with the chief or deputy chief of corrections on a recommended course of action.

46. The CCS Defendants knew that hunger strikes could affect the health and life of inmates, as evidenced by their written plan for addressing hunger strikes in effect at the time Ms. Gomes was in custody, which provided for, inter alia, urgent assessment for the presence of serious mental illness to determine whether the hunger striker was mentally incompetent to make

decisions about her treatment; and if serious mental illness is present, the inmate is not competent, and the hunger strike is dangerous to her physical health, providers should provide forcible nutrition while seeking forcible psychiatric treatment, and should resort to court for an order for forcible treatment and forcible nutrition.

47. Defendants made no attempt to provide forcible nutrition to Ms. Gomes, did not provide forcible nutrition to Ms. Gomes, and did not initiate any court proceedings regarding her.

48. The LCJ and CCS Defendants failed to comply with nationally accepted standards in their handling and treatment of Ms. Gomes.

49. As a result of Defendants' actions and inactions described above, Ms. Gomes' condition precipitously deteriorated and she died, whereas if they had acted consistent with generally accepted medical and correctional standards of care, she would be alive today.

50. The harms to Ms. Gomes were the direct and proximate result of the deliberate indifference of all Defendants.

51. At all relevant times, the Defendants were aware of Ms. Gomes' serious medical and mental health needs, and they failed, with deliberate indifference, to ensure that she receive proper care and treatment.

52. At all times relevant to this Complaint, as evidenced by the lack of appropriate care provided to Ms. Gomes, the Lake County and CCS Defendants with deliberate indifference failed to develop and implement policies, practices and procedures to ensure that inmates at Lake County Jail would receive appropriate care for serious physical and mental health conditions and, if necessary, health care services outside the jail.

14

53. At all times relevant to this Complaint, the Lake County and CCS Defendants with deliberate indifference failed to properly train, supervise and discipline medical personnel at Lake County jail so as to ensure that inmates would receive appropriate care for serious physical and mental health conditions, and, if necessary, a referral by medical personnel for health care services outside the jail.

54. At all times relevant to this Complaint, the Lake County and CCS Defendants with deliberate indifference to the serious medical and mental health needs of inmates at Lake County Jail, operated under a contractual agreement that created a powerful financial disincentive for jail and medical staff to send an inmate with serious physical and/or mental health conditions for health care services outside the jail.

55. Defendants Curran, Hunter, Fitch, Elazegui and Singh, with other unsued co-conspirators, correctional and health care providers and supervisory personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to deliberately deny Lyvita Gomes necessary medical and mental health care as well as to cover up their own misconduct.

56. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in this Complaint.

57. Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's injuries under state law, as set forth above.

58. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to deliberately deny Lyvita Gomes necessary medical and mental health care and cover up their own misconduct, constitute the tort of

conspiracy.

59.  None of the Defendants has been disciplined in any way as a result of the conduct, acts or omissions described in this Complaint.

60.  As a direct and proximate result of these Defendants' actions, as detailed above, Lyvita Gomes and her heirs suffered, inter alia, injury, pain, distress, loss of love, affection, society, companionship and consortium as well as other injuries, including her death and the loss of her life.

## COUNT I
### [§1983 Fourteenth Amendment
### Due Process Claims: Lake County]

61.  Plaintiff realleges paragraphs 1 through 60.

62.  Plaintiff alleges an action pursuant to the Fourteenth Amendment against Lake County and Defendants Curran, Hunter and Fitch.

63.  Lyvita Gomes, as a person in custody, was in a special relationship with the LCJ Defendants, within the meaning of the case law interpreting 42 U.S.C. §1983, which prohibits any person acting under color of federal law, from subjecting any person in custody to punitive conditions of confinement without due process of law.

64.  Lake County Defendants, acting under color of law, intentionally and with conscious, callous, and deliberate indifference deprived Ms. Gomes of her constitutional rights to due process.

65.  The LCJ Defendants' above-described conduct, acts and/or omissions constituted deliberate indifference to Lyvita Gomes' serious medical and mental health needs, and violated her rights under the Fourteenth Amendment to the United States Constitution to due process of

law, and violated 42 U.S.C. §1983.

66. Lake County Defendants' conduct, actions and/or omissions were the direct and proximate cause of the violations of Ms. Gomes' Fourteenth Amendment rights, her mental suffering, anguish, other injuries, and death.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands actual or compensatory damages against Lake County and Defendants Curran, Hunter and Fitch, and because the individual Lake County Defendants acted maliciously, wantonly, or oppressively, punitive damages against them in their individual capacities, plus the costs of this action, plus attorneys' fees and such other and additional relief as this Court deems equitable and just.

## COUNT II
### [§1983 Fourteenth Amendment
### Due Process Claims: CCS ]

67. Plaintiff realleges paragraphs 1 through 60.

68. Plaintiff alleges an action pursuant to the Fourteenth Amendment against Defendant CCS and individual Defendants Elazegui and Singh.

69. Lyvita Gomes, as a person in custody, was in a special relationship with the CCS Defendants, within the meaning of the case law interpreting 42 U.S.C. §1983, which prohibits any person acting under color of federal law, from subjecting any person in custody to punitive conditions of confinement without due process of law.

70. The CCS Defendants, acting under color of law, intentionally and with conscious, callous, and deliberate indifference deprived Ms. Gomes of her constitutional rights to due process.

71. The CCS Defendants' above-described conduct, acts and/or omissions constitute deliberate indifference to Ms. Gomes' serious medical and mental health needs, and violated her

17

rights under the Fourteenth Amendment to the United States Constitution to due process of law, and violated 42 U.S.C. §1983.

72. CCS Defendants' conduct, actions and/or omissions were the direct and proximate cause of the violations of Ms. Gomes' Fourteenth Amendment rights, her mental suffering, anguish, other injuries, and death.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands actual or compensatory damages against Defendant CCS and Defendants Elazegui and Singh, and because the individual CCS Defendants acted maliciously, wantonly, or oppressively, punitive damages against them in their individual capacities, plus the costs of this action, plus attorneys' fees and such other and additional relief as this Court deems equitable and just.

## COUNT III
### [ADA Claim:
### Lake County]

73. Plaintiff realleges paragraphs 1 through 60.

74. Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendants Lake County and Curran.

75. The Lake County Jail is a facility, and its operation comprises a program and service for Title II purposes.

76. Lyvita Gomes had medical and mental health disabilities throughout the time she was in the Defendants' custody and care.

77. Defendants failed to reasonably accommodate Lyvita Gomes' medical and mental health disabilities and to modify their jail facilities, operations, services, accommodations and programs to reasonably accommodate Ms. Gomes' disability, in violation of Title II of the ADA.

18

78. Defendants' violations of the ADA were the proximate cause of Ms. Gomes' injuries, damages and death and the resulting damage to her estate.

79. Plaintiff is entitled to recover, as the representative of Ms. Gomes' estate, for those damages sustained as described in this Complaint as a result of Defendants' violations of the ADA which caused her death.

WHEREFORE, pursuant to the Americans with Disabilities Act, Plaintiff demands actual or compensatory damages against Defendants Lake County and/or Curran, as well as punitive damages, plus the costs of this action, plus attorneys' fees and such other and additional relief as this court deems equitable and just.

**COUNT IV**
**[ADA Claim:CCS]**

80. Plaintiff realleges paragraphs 1 through 60.

81. Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to CCS.

82. The Lake County Jail is a facility, and its operation comprises a program and service, for Title II purposes. CCS has contracted to provide services for a portion of the operation of the jail facility.

83. Lyvita Gomes had medical and mental health disabilities throughout the time she was in the Defendants' custody and care.

84. Defendant CCS failed and refused to reasonably accommodate Lyvita Gomes' medical and mental health disabilities and to modify their jail facilities, operations, services, accommodations and programs to reasonably accommodate Ms. Gomes' disability, in violation of

19

Title II of the ADA, when she was in LCJ custody.

85.  Defendant's failures cost Ms. Gomes her life, and the violations of the ADA are the proximate cause of Ms. Gomes' death and the resulting damage to her estate.

86.  Plaintiff is entitled to recover, as the representative of Ms. Gomes' estate, for those damages sustained as described in this Complaint as a result of Defendants' violations of the ADA which caused her death.

WHEREFORE, pursuant to the Americans with Disabilities Act, Plaintiff demands actual or compensatory damages against Defendant CCS, as well as punitive damages, plus the costs of this action, plus attorneys' fees and such other and additional relief as this court deems equitable and just.

**COUNT V**
**[International Law Claim for Violation of Treaties, Conventions: Lake County]**

87.  Plaintiff realleges paragraphs 1 through 60.

88.  The United States and India are signatories to the Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261, a multilateral treaty, which required the Lake County Defendants to notify, without delay, the Indian Consulate when they detained its national, Lyvita Gomes.

89. Among other mandates, the Convention also required authorities to notify an arrested foreign national of "his rights" under the Convention "without delay." Art. 36, 1.(b).

90.  The Lake County Defendants failed to notify the Indian Consulate of their detention of Lyvita Gomes.

91.  The Lake County Defendants failed to properly, adequately and comprehensively notify

20

Ms. Gomes of her rights to contact the Indian Consulate.

92. Failure to notify without delay the Indian Consulate and/or Lyvita Gomes of her right to contact the Indian Consulate, prevented meaningful communication between Ms. Gomes and an official of her own culture, which would have alleviated her feelings of isolation, hopelessness, distress, anxiety, panic, and would have prevented her death.

93. The conduct, actions and/or omissions of Lake County Defendants were the direct and proximate cause of the violations of Ms Gomes' rights, and her mental suffering, anguish, death and other injuries to her estate and her heirs.

WHEREFORE, pursuant to international law, treaties and the Vienna Convention, Plaintiff demands actual or compensatory damages against the Lake County individual Defendants, and because these Defendants acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, plus attorneys' fees and such other and additional relief as this Court deems equitable and just.

## COUNT VI
### [42 U.S.C. §1983 *Monell* Policy, Practice and Custom Claim: Lake County]

94. Plaintiff realleges paragraphs 1 through 60.

95. The violations of Ms. Gomes' constitutional rights under Fourteenth Amendment to the United States Constitution, her damages and the conduct of the individual defendants, were directly and proximately caused by the actions and/or inactions of the Lake County Defendants, which have, with deliberate indifference:

a) failed to establish and/or implement policies, practices and procedures to ensure that inmates at Lake County Jail receive appropriate medical care for serious physical and mental

health needs, and if necessary, health care services outside the jail, and to do so without regard for profit or expense;

b) failed to establish and/or implement policies, practices and procedures in the event inmates refuse to participate in and/or cooperate with medical and mental health evaluations, examinations, laboratory testing, assessments or referrals;

c) failed to establish and/or implement policies, practices and procedures to seek court intervention for the safety and well being of inmates, and to do so without regard for profit or expense;

d) failed to establish and/or implement policies, practices and procedures to ensure that inmates at Lake County Jail receive appropriate medical care for serious medical and mental health needs;

e) failed to establish and/or implement policies, practices and procedures to ensure that inmates receive adequate nutrition for their safety and well being;

f) failed to adequately assess and provide adequate care and treatment for inmates who are a danger to themselves or others at Lake County Jail;

g) failed to adequately monitor the deteriorating medical and mental health conditions of inmates;

h) failed to ensure through training, supervision and discipline that medical staff at Lake County Jail, in necessary circumstances, make a referral for health care services outside the jail;

i) failed to ensure through training, supervision and discipline that correctional and medical staff adequately communicate and document inmates' deteriorating medical and mental health conditions;

j) failed to ensure through training, supervision and discipline that correctional and medical staff properly respond to inmates' deteriorating medical and mental health conditions;

k) failed to contract for medical and mental health services in a manner so that financial incentives would not affect referring inmates for health care services outside the jail;

l) failed to adequately train correctional officers, employees, agents and administrators regarding notifications to the consulates of foreign nationals that their nationals, like Ms. Gomes, are detained;

m) failed to adequately train correctional officers, employees, agents and administrators to notify foreign nationals, like Ms. Gomes, of their rights to contact their consulates.

n) possessed knowledge of deficiencies in the policies, practices, customs and procedures concerning inmates, and approved and/or deliberately turned a blind eye to these deficiencies.

WHEREFORE, Plaintiff demands judgment against Defendants Lake County and Curran for compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VII
### [42 U.S.C. §1983 *Monell* Policy, Practice and Custom Claim: CCS]

96. Plaintiff realleges paragraphs 1 through 60.

97. The violations of Ms. Gomes' constitutional rights under the Fourteenth Amendment to the United States Constitution, her damages and the conduct of the individual defendants, were directly and proximately caused by the actions and/or inactions of CCS, which have, with deliberate indifference:

23

a) failed to establish and/or implement policies, practices and procedures to ensure that inmates at Lake County Jail receive appropriate medical care for serious physical and mental health needs, and if necessary, health care services outside the jail;

b) failed to establish and/or implement policies, practices and procedures in the event inmates refuse to participate in and/or cooperate with medical and mental health evaluations, examinations, laboratory testing, assessments or referrals;

c) failed to establish and/or implement policies, practices and procedures to seek court intervention for the safety and well being of inmates;

d) failed to establish and/or implement policies, practices and procedures to ensure that inmates at Lake County Jail receive appropriate medical care for serious medical and mental health needs;

e) failed to establish and/or implement policies, practices and procedures to ensure that inmates receive adequate nutrition for their safety and well being;

f) failed to adequately assess and provide adequate care and treatment for inmates who are a danger to themselves or others at Lake County Jail;

g) failed to adequately monitor the deteriorating medical and mental health conditions of inmates;

h) failed to ensure through training, supervision and discipline that medical staff at Lake County Jail, in necessary circumstances, make a referral for health care services outside the jail;

i) failed to ensure through training, supervision and discipline that correctional and medical staff adequately communicate and document inmates' deteriorating medical and mental health conditions;

24

j) failed to ensure through training, supervision and discipline that correctional and medical staff properly respond to inmates' deteriorating medical and mental health conditions;

k) failed to contract for medical and mental health services in a manner so that financial incentives would not affect referring inmates for health care services outside the jail;

l) possessed knowledge of deficiencies in the policies, practices, customs and procedures concerning inmates, and approved and/or deliberately turned a blind eye to these deficiencies.

WHEREFORE, Plaintiff demands judgment against Defendant CCS for compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VIII
### [State Law Claim for Wrongful Death: Lake County]

98.  Plaintiff realleges paragraphs 1 through 60 and 95.

99.  Lyvita Gomes was and is survived by her father Lamartine Conception Gomes, brother Oyd Steven Gomes, sister Lyemia Fernandes, and sister Lynette Gomes, who constitute her heirs under Illinois law.

100.  Decedent Lyvita Gomes was officially pronounced dead on January 3, 2012.

101.  The wrongful death of Lyvita Gomes was proximately caused by the neglect, default, and/or willful and wanton conduct of the Defendants, as described above, in violation of 740 ILCS § 180/1.

102.  The Lake County Defendants' wrongful conduct was the direct and proximate cause of injury and damage to Lyvita Gomes and her estate.

103.  As next of kin, the heirs of Lyvita Gomes have lost and will continue to lose, pecuniary support, consortium, society, companionship as well as the love and affection of their cherished daughter and sister and have incurred funeral and burial experiences as a proximate result of her wrongful death.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, against the Lake County Defendants, and such other and further relief as this Court deems equitable and just.

## COUNT IX
### [State Law Claim for Wrongful Death: CCS]

104.  Plaintiff realleges paragraphs 1 through 60 and 97.

105.  Lyvita Gomes was and is survived by her father Lamartine Conception Gomes, brother Oyd Steven Gomes, sister Lyemia Fernandes, and sister Lynette Gomes, who constitute her heirs under Illinois law.

106.  Decedent Lyvita Gomes was officially pronounced dead on January 3, 2012.

107.  The wrongful death of Lyvita Gomes was proximately caused by the neglect, default, and/or willful and wanton conduct of the Defendants, as described above, in violation of 740 ILCS § 180/1.

108.  The CCS Defendants' wrongful conduct was the direct and proximate cause of injury and damage to Lyvita Gomes and her estate.

109.  As next of kin, the heirs of Lyvita Gomes have lost and will continue to lose, pecuniary support, consortium, society, companionship as well as the love and affection of their cherished daughter and sister and have incurred funeral and burial experiences as a proximate result of her wrongful death.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, against the CCS Defendants, and such other and further relief as this Court deems equitable and just.

## COUNT X
### [State Law Claim for IIED: Lake County]

110.  Plaintiff realleges paragraphs 1 through 60 and 95.

111.  The Lake County Defendants, individually and jointly, engaged in extreme and outrageous conduct as set forth in this Complaint by, *inter alia*, refusing and failing to respond to Ms. Gomes' serious medical and mental health needs and being deliberately indifferent to her mental and physical suffering.

112.  Defendants intended by subjecting Lyvita Gomes to such conduct to inflict severe emotional distress upon her and knew that their conduct would cause her and her family severe emotional distress.

113.  As a direct and proximate result of Defendants' outrageous conduct, Ms. Gomes was injured, and suffered actual damages.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, against the Lake County Defendants, and such other and further relief as this Court deems equitable and just.

## COUNT XI
### [State Law Claim for IIED: CCS]

114.  Plaintiff realleges paragraphs 1 through 60 and 97.

115.  The CCS Defendants, individually and jointly, engaged in extreme and outrageous conduct as set forth in this Complaint by, *inter alia*, refusing and failing to respond to her serious medical and mental health needs and being deliberately indifferent to her mental and physical suffering.

116.  Defendants intended by subjecting Lyvita Gomes to such conduct to inflict severe emotional distress upon her and knew that their conduct would cause her and her family severe emotional distress.

117.  As a direct and proximate result of Defendants' outrageous conduct, Ms. Gomes was injured, and suffered actual damages.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, against the CCS Defendants, and such other and further relief as this Court deems equitable and just.

## COUNT XII
## [State Law Claim for Conspiracy: Lake County]

118.  Plaintiff re-alleges paragraphs 1 through 60 and 95.

119.  Defendants Curran, Hunter and Fitch, with other unsued co-conspirators, correctional and health care providers and supervisory personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to deliberately deny Lyvita Gomes necessary medical and mental health care as well as to cover up their own misconduct.

120.  In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in this Complaint.

121.  Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's injuries under state law, as set forth above.

122. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to deliberately deny Lyvita Gomes necessary medical and mental health care and cover up their own misconduct, constitute the tort of

conspiracy.

WHEREFORE,  Plaintiff demands compensatory damages, jointly and severally, from the Lake County individual defendants, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Ms. Gomes, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT XIII
### [State Law Claim for Conspiracy: CCS]

123.  Plaintiff re-alleges paragraphs 1 through 60 and 97.

124.  Defendants Elazegui and Singh, with other unsued co-conspirators, correctional and health care providers and supervisory personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to deliberately deny Lyvita Gomes necessary medical and mental health care as well as to cover up their own misconduct.

125.  In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in this Complaint.

126.  Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's torturous injuries under state law, as set forth above.

127. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to deliberately deny Lyvita Gomes necessary medical and mental health care and cover up their own misconduct, constitute the tort of conspiracy as set forth above.

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, from the CCS individual defendants, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Ms. Gomes, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

**COUNT XIV**
**[State Law Claim for *Respondeat Superior*:**
**Lake County Sheriff]**

128. Plaintiff realleges paragraphs 1 through 60 and 95.

129. Defendants Hunter and Fitch were, at all times relevant to this Count, employees and agents of the Lake County Sheriff. Each of the above-named individual Defendants was acting within the scope of his employment, and his acts and omissions are directly chargeable to his employer, the Defendant Lake County Sheriff, under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment for compensatory damages, jointly and severally from the Defendant Lake County Sheriff.

**COUNT XV**
**[State Law Claim for *Respondeat Superior*: CCS]**

130. Plaintiff realleges paragraphs 1 through 60 and 97.

131. Defendants Elazegui and Singh were, at all times relevant to this Count, employees and agents of CCS. Each of the above-named individual Defendants was acting within the scope of his/her employment, and his/her acts and omissions are directly chargeable to his/her employer, CCS, under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff demands judgment for compensatory damages, jointly and severally from the Defendant CCS.

## COUNT XVI
### [State Law Claim pursuant to 745 ILCS 10/9-102
### Lake County and/or Lake County Sheriff ]

132.  Plaintiff realleges paragraphs 1 through 60.

133.  Pursuant to §9-102 of the Local Government and Governmental Employees Tort Immunity Act ("the Act"), a local public entity is directed to pay any tort judgment or settlement for compensatory damages for which it or an employee acting within the scope of his employment is liable.  745 ILCS 10/9-102.

134.  Mark Curran, the Sheriff of Lake County, and the County of Lake are local public entities as defined in the Act.  745 ILCS 10/1-206.

135.  Defendants Hunter and Fitch at all relevant times were "employees" of the Sheriff of Lake County as defined by the Act.  745 ILCS 10/1-202.  That definition includes "officers" and "employees."

136.  Certain conduct of defendants Hunter and Fitch as described in this Complaint was willful and wanton as defined in the Act.  745 ILCS 10/1-1-210.

137.  Defendants Hunter and Fitch acted within the scope of their employment by Mark Curran, Sheriff of Lake County and the County of Lake.

138.  Pursuant to the Act, Mark Curran, Sheriff of Lake County and/or the County of Lake are directly liable for the conduct of defendants Hunter and Fitch.

WHEREFORE, Plaintiff demands judgment against the defendant Mark Curran, Sheriff of Lake County and/or the County of Lake in the amount awarded to Plaintiff against any and all individual Lake County Defendants as damages, attorney's fees, costs and interest, and/or for any settlement entered into between the Plaintiff and Lake County Defendants, and for whatever

additional relief this Court deems equitable and just.

Dated: June 6, 2012                         Respectfully submitted,


 /s/ Jan Susler
JANINE L. HOFT
JAN SUSLER
People's Law Office
1180 N. Milwaukee Avenue
Chicago, Illinois 60642
773/235-0070

Attorneys for the Plaintiffs


**Plaintiff demands a jury trial**