# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ESTATE OF LYVITA GOMES, deceased, by )
Alfredo Miranda, Administrator, )
                                                )
                  Plaintiffs, )           Case No. 12 cv 4439
                                                  )
v. )           Judge Sharon Johnson Coleman
                                                  )
COUNTY OF LAKE, MARK CURRAN, WAYNE )
HUNTER, SCOTT FITCH, CORRECT CARE )
SOLUTIONS, LLC, ROZEL ELAZAGUI, M.D., )
HARGURMUKH P. SINGH, M.D., JENNIFER )
BIBBIANO, RUTH MUURU, and EDITH JONES, )
                                                  )
                  Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff filed a seventeen-Count First Amended Complaint against Lake County, individual Lake County Deputy Sheriffs, and the medical personnel employed by Correct Care Solutions at Lake County Jail in December 2011. The Lake County defendants move for summary judgment [130] and the medical defendants move for partial summary judgment [134]. For the reasons set forth below, this Court grants the Lake County defendants' motion and grants in part and denies in part the medical defendants' motion.

**Background**

The following facts are undisputed.[1] In December 2011, plaintiff's decedent, Lyvita Gomes, was a 52-year-old Indian national living in Vernon Hills, Illinois. (Dkt. 132, Lake County Defs. 56.1 Statement of Facts ("SOF"), ¶ 1). Defendant Mark Curran was the Sheriff of Lake County. (*Id.* at ¶

---

[1] The Court notes that plaintiff did not adhere to Local Rule 56.1 in response to defendants', particularly the medical defendants', statements of undisputed material facts. Plaintiff's responses contain lengthy argument and legal conclusions, instead of the citations to facts in the record that contradict defendants' statements that such responses are intended to contain. The Court further notes that plaintiffs' LR 56.1 statement of additional facts is also replete with legal conclusion and improper argument. This Court will disregard all improperly presented argument and legal conclusions.

2). Defendant Wayne Hunter was the Deputy Chief of Administration and acting Chief of Corrections for the Lake County jail. (*Id.* at ¶ 3). As acting Chief of Corrections, Chief Hunter supervised and met with Deputy Chief Megan Mercado, every day to discuss jail business. (*Id.*) Deputy Chief Mercado was responsible for running the day-to-day operations of Lake County jail. (*Id.*) Chief Hunter also met daily with Sheriff Curran. (Dkt. 142, Pl. Resp. to Defs. SOF, at ¶ 3). Although Chief Hunter has a master's degree in counseling psychology, his duties at the jail did not include providing mental health care to inmates. (*Id.* at ¶ 4). Defendant Correct Care Solutions ("CCS") was responsible for providing all medical and mental health care services to inmates at Lake County jail. (Dkt. 132 at ¶ 5). Defendant Scott Fitch was employed by the Lake County Sheriff's Department to act as a liaison between the jail and CCS. (*Id.* at ¶ 6). Fitch's duties did not include treating inmates or supervising and training CCS staff. (*Id.* at ¶ 7). His role, among other things, was to coordinate and implement health services for the inmates at the jail, and to evaluate the effectiveness of contracted psychological services. (Dkt. 142 at ¶ 7). Sheriff Curran and Jail Command relied on CCS to provide medical and mental health services to inmates pursuant to the Health Services Contract. (Dkt. 132 at ¶ 8).

Defendants Dr. Rozel Elazegui (internal medicine physician), Dr. Hargurmukh Singh (psychiatrist), Jennifer Bibbiano (social worker and Director of Mental Health), Ruth Muuru (Licensed Professional Counselor) and Edith Jones (Licensed Professional Counselor), were healthcare providers with CCS to provide medical or mental health treatment to inmates at Lake County jail. (*Id.* at ¶ 9). Bibbiano assessed Gomes on five occasions (December 16, 19, 20, 21, and 28), noting Gomes' refusal to answer questions or participate in the mental health examination. (Dkt. 134, Medical Defs. 56.1 SOF, at ¶ 6). Muuru assessed Gomes twice (December 24 and 26), documenting in her progress notes that Gomes suffered from suicidal ideation, though Muuru testified in her deposition that she did not believe Gomes suffered from a mental health problem.

(*Id.* at ¶ 7). Jones saw Gomes twice: December 18 and 25, 2011. (*Id.* at ¶ 8). On December 22, 2011, Bibbiano, Muuru, or Jones, or someone on the medical staff, placed Gomes on the list to see the psychiatrist, indicating that it was "urgent." (Dkt. 134 at ¶ 31; Dkt. 138 at ¶ 6).

Michael Keegan, who is not a party to this lawsuit, was the Health Services Administrator employed by CCS to manage and supervise the medical and mental health care professionals at the jail. (Dkt. 132 at ¶ 10). When CCS could not meet the healthcare needs of an inmate at the jail, they would refer the inmate off-site for additional services, including calling an ambulance for urgent care. (*Id.* at ¶ 11). Jail Command relied on CCS to tell them when it was necessary to transfer an inmate off-site for additional medical services. (*Id.*) Lake County never asked CCS to lower off-site expenditures and inmates were transferred to a hospital when CCS determined they needed to be. (*Id.* at ¶ 12).

Gomes was arrested on October 12, 2011, on a body attachment for contempt for failure to appear for jury duty. (*Id.* at ¶ 13). She was brought to Lake County jail where she was also charged with resisting a peace officer. (*Id.*) On October 14, 2011, she was transferred to Immigration and Customs Enforcement ("ICE") custody and questioned regarding her immigration status. (*Id.* at ¶ 14). During an interview with ICE she was advised of her rights, including the right to speak with a consular or diplomatic officer from her home country. (*Id.* at ¶ 15). She refused the phone call and did not otherwise request the Indian consulate be notified of her detention. (*Id.*) ICE processed and released her.

On December 14, 2011, Gomes was arrested by the Vernon Hills Police Department on an active bench warrant for failure to appear in court on the underlying charge of resisting a peace officer and was brought to the Lake County jail for booking at approximately 7:45 p.m. (Dkt. 132 at ¶ 16). The initial intake form, completed by Nurse Ennis, indicated that Gomes was anxious and

appeared paranoid because she kept asking about the medical staff's credentials.[2] (Dkt. 138, Pl. Resp. to Med. Defs. SOF, at ¶ 12). She was initially placed in the general population female pod, 5 Southeast. (Dkt. 132 at ¶ 17). The 5 Southeast pod is two stories with approximately 20 cells. (*Id.*) Gomes' cell was on the second floor. (*Id.*) The mental health intake form completed on December 16, 2011, notes that Gomes had not eaten since her arrival in jail and she should be referred to medical if it persists for 72 hours. (Dkt. 132-334, CCS Records, Ex. 33). On December 17, 2011, Gomes was transferred to the medical pod because she was not eating and CCS staff could observe her more closely in the medical pod. (*Id.* at ¶ 18). Correctional officers and CCS medical and mental health staff worked both worked in the medical pod and communicated about inmates, including Gomes orally and in writing. (*Id.* at ¶ 19).

On December 18, 2011, CCS put Gomes on CCS' Hunger Strike protocol after correctional staff notified CCS personnel that Gomes had not eaten for 72 hours. (*Id.* at ¶ 20). Gomes was under the care and treatment of CCS doctors, nurses, and mental health professionals from the time CCS instituted its Hunger Strike protocol on December 18, 2011, until she was transferred to hospital on December 29, 2011. (*Id.* at ¶ 21). The Hunger Strike protocol included explaining the risks and harms of starvation and encouraging her to eat. On December 18, 2011, the nurse noted Gomes weight was 146 lbs. and her vital signs were within normal limits, but Gomes refused to provide a urine sample. (Dkt. 138 at ¶ 16). Jones also saw Gomes on December 18, 2011. (Dkt. 134 at ¶ 17). Gomes told Jones she would not eat until she left the jail. (*Id.*) Jones placed her on suicide watch on December 18, 2011, based on her conclusion that not eating and drinking were suicidal behaviors. (*Id.*)

On December 19, 2011, Bibbiano saw Gomes and noted her refusal to answer questions. (*Id.* at ¶ 20). She appeared to be alert, calm, and well-kept. (*Id.*) Bibbiano further noted that Gomes was

_____

[2] The CCS nursing staff is not a party to this lawsuit.

scheduled to see Dr. Young Kim, who was advised of Gomes' hunger strike. Dr. Kim assessed Gomes and ordered extra juice with each meal. (*Id.*)

In the morning on December 20, 2011, the nurse noted Gomes' mouth and tongue were moist, she had no tenting of her skin (which would be a sign of dehydration), and that she displayed a steady gait when standing. (*Id.* at ¶ 21). Later that day, Nurse Davalos noted minor tenting of Gomes' skin. (Dkt. 138 at ¶ 21). Bibbiano also saw her on December 20, 2011, noting her refusal to speak. (Dkt. 134 at ¶ 22). On December 20, 2011, when Gomes appeared in court, the judge ordered a mental fitness evaluation to be completed by January 5, 2012.

On the morning of December 21, 2011, Nurse Griffin noted Gomes' weight to be 140 lbs. and took her vital signs. (*Id.* at ¶ 23). Bibbiano also saw Gomes on December 21, noting her refusal to speak, but that she was calm and alert. (*Id.* at ¶ 25). The following day, the nurse took vital signs and noted Gomes' refusal to provide a urine sample. Dr. Elazegui also examined Gomes on December 22, 2011, noting that she was in no apparent distress, she appeared nontoxic, and she had moist mucus membranes. (*Id.* at ¶ 27). During his examination, Dr. Elazegui stressed to Gomes the nutritional need to survive and offered to order her any food on the menu. Dr. Elazegui also ordered urinalysis, blood work, an EKG, a multivitamin and that if she resumed eating, Gomes should have a low calorie diet to avoid the risk of refeeding syndrome. (*Id.* at ¶ 28). Dr. Elazegui ordered the nurses to continue daily vital sign monitoring and to advise him if Gomes' heart rate became greater than 120 or if she exhibited any signs of hypotension (low blood pressure). (*Id.* at ¶ 29).

On December 23, 2011, the nurse took Gomes' vital signs and noted her weight was 136 lbs. (Dkt. 132 at ¶ 32). Muuru saw Gomes that day, noting that she refused to speak. Muuru encouraged Gomes to start eating. (*Id.* ¶ 33). Later on December 23, 2011, Gomes refused the nurse's attempt to obtain a blood sample. (*Id.* ¶ 34). The nurse advised Dr. Elazegui of Gomes' refusal, who ordered

that her vitals be taken every four hours and that nurses continue to try to obtain test samples or an EKG. (*Id.*)

On the morning of December 24, 2011, Gomes refused to allow the nurses to take her vital signs. (*Id.* at ¶ 36). At 4:00 p.m. Nurse Ennis was able to obtain Gomes' vital signs and performed a blood sugar test. Nurse Ennis was also able to take Gomes' vitals (seated) later that evening and noted that Gomes had been observed rubbing water on her skin. (Dkt. 138 at ¶ 37). Dr. Singh, the psychiatrist, examined Gomes on December 24, 2011, and diagnosed "psychotic disorder not otherwise specified," but could not prescribe any medication because Gomes refused to speak to him. (Dkt. 132 at ¶ 38). He set a follow-up visit for December 27, 2011. (*Id.*)

On December 25, 2011, Gomes refused some of the nurses' attempts to take her vital signs and record her weight, but did allow Nurse Ramirez to do so. (*Id.* at ¶ 39). Nurse Ramirez noted a loss of 14 lbs. since December 18, 2011. (Dkt. 138 at ¶ 39). Defendant Jones also examined Gomes on December 25, 2011, and found her to be calm, alert, and well kept. (Dkt. 134 at ¶ 40). Later that evening, Gomes refused to allow her vitals to be taken. (*Id.* ¶ 41).

On December 26, 2011, Nurse Weeger was unsuccessful in obtaining Gomes' vital signs, but another nurse was able to do so. (Dkt. 134 at ¶ 42). Nurse Ramirez called Dr. Elazegui to inform him of Gomes' status. Her weight was now at 131.5 lbs. (Dkt. 138 at ¶ 42). Later that day, Nurse Pecaut examined Gomes and advised Dr. Elazegui of Gomes' refusal to cooperate with testing. (Dkt. 134 at ¶ 43). He ordered Gomes to be on strict bed rest and for the medical staff to advise him if Gomes' weight loss reached 18% of her initial weight. (*Id.*) Defendant Muuru also examined Gomes on December 26, 2011, noting that she was alert, oriented, and well-kept. (*Id.* at ¶ 44). Gomes refused to acknowledge the medical staff later that evening when they attempted to examine her. (*Id.* at ¶ 45).

Chief Hunter testified in his deposition that he did not recall hearing about Gomes until he received an email on December 26, 2011, stating that she was in the medical pod and had refused treatment and tests. (Dkt. 142 at ¶ 23). Hunter understood from the email that Gomes was being monitored by CCS every four hours. (*Id.*) Fitch was off duty from December 21 to December 26, 2011. (Dkt. 132 at ¶ 24). He first heard about Gomes situation upon his return to duty. (Dkt. 142 at ¶ 25). He called Health Services Administrator Keegan to his office for a report on Gomes condition. (*Id.*) Keegan advised him that Gomes had been seen by both a physician and a psychiatrist, CCS was monitoring Gomes pursuant to their Hunger Strike protocol, that she would be seen again by a physician and psychiatrist as soon as possible on December 27, 2011, that she was not allowing medical staff to take lab draws or perform tests, and that staff thought Gomes might be drinking from her sink. (*Id.*) Fitch asked Keegan to make sure that the physician and psychiatrist met to discuss Gomes. (*Id.* ¶ 26). According to jail policy, inmates cannot be forcibly medicated at the jail without a psychiatrist or physician's order. (Dkt. 132 at ¶ 31). The jail did not have the ability to administer an IV or to force feed an inmate on site. (Dkt. 151, Med. Defs. Resp. to Pl. 56.1 Statement of Additional Facts at ¶ 5).

The nurses were not always successful in obtaining Gomes' vital signs on December 27, 2011, though her weight was recorded on this date as 130 lbs. (Dkt. 134 at ¶ 46). When Dr. Elazegui examined Gomes in the morning on December 27, 2011, he, too, believed Gomes must be drinking fluids because he saw no signs of dehydration. (*Id.* ¶ 47). He suggested a psychiatric evaluation and a consultation with the CCS legal department. (*Id.*) Fitch reviewed Dr. Elazegui's notes, which stated that she was medically stable. CCS psychiatrist Dr. Singh examined Gomes on December 27, 2011, finding that she was in a psychotic state of mind, that her judgment was impaired, and that she was not clinically competent to participate in her own treatment plan. (Dkt. 138 at ¶ 48). Dr. Elazegui,

Dr. Singh, HSA Keegan, Nurse Pecaut, and Bibbiano met to discuss Gomes' care and to determine if a court order was necessary to provide further care against Gomes' will. (Dkt. 132 at ¶ 49).

Also on December 27, 2011, Fitch informed Gomes attorney, Assistant Public Defender Elizabeth Schroeder that Gomes was on a hunger strike, that she was not drinking liquids that staff gave her but that she was taking water from the sink, that she was weak but medically stable, Dr. Singh could not forcibly medicate her, and that her vital signs were checked regularly and seemed fine. (*Id.* ¶ 32). Fitch encouraged Schroeder to visit Gomes to encourage her to eat, and to try to move up the date of the fitness evaluation because her refusal to eat might be associated with a mental health issue. (*Id.* ¶ 33). Schroeder visited Gomes in the afternoon on December 27, 2011. (*Id.* ¶ 35). After her visit, Schroeder called Fitch because she was concerned about Gomes' physical health and wanted to let him know the jail did not need a court order to transfer her to hospital for emergency services. (*Id.* ¶ 36). Fitch informed Schroeder that he knew Gomes could be sent to the hospital without a court order, that she was being treated by CSS medical professionals, and that CCS had not advised that Gomes needed to go to the hospital. (*Id.* ¶ 37). Schroeder raised her concerns with her supervisor at the Public Defender's Office. (*Id.* ¶ 38).

In the afternoon on December 27, 2011, Keegan advised Fitch that Dr. Elazegui and Dr. Singh had consulted, they were continuing on the established orders of Dr. Elazegui, and they were going to contact CCS legal counsel for advice. (*Id.* ¶ 39). Fitch emailed Deputy Chief Mercado to advise her that the physician and psychiatrist had met to discuss Gomes, the psychiatrist had diagnosed Gomes with psychosis, but did not have grounds to forcibly medicate her, the physician believed Gomes was medically stable, and, at Fitch's request, Schroeder was going to move up the date for the fitness hearing. (*Id.* ¶ 33). Fitch concluded that she should be found unfit and sent to Elgin as soon as possible. (Dkt. 142 at ¶ 40). Fitch reviewed Gomes' chart before leaving for the day. (Dkt. 132 at ¶ 41).

Chief Hunter brought up Gomes' situation in his daily morning meeting with Deputy Chief Mercado on December 27, 2011. (*Id.* at ¶ 42). Mercado advised Hunter that Gomes was on a hunger strike and that she would keep him posted on Gomes' condition. (*Id.*) She also advised Hunter that Gomes was on suicide watch, being observed every fifteen minutes by correctional officers. (*Id.* at ¶ 43).

On December 28, 2011, when Nurse Ramirez examined her, Gomes' weight was 128 lbs. and she noted that Gomes had moist mucus membranes and skin tenting of +1 and +2 in her lower extremities. (Dkt. 134 at ¶ 52). Her notes state that Gomes was in bed both times, that Ramirez called a doctor, and on December 28, Gomes appeared weak, and had signs of dehydration and weight loss. (Dkt. 138 at ¶ 52).

On December 28, 2011, Keegan advised Fitch that Gomes was stable and that CCS had contacted their corporate office for advice. (Dkt. 132 at ¶ 45). Chief Hunter met with Mercado in the morning on December 28, 2011. (*Id.* at ¶ 46). She advised Hunter that Gomes still had not eaten and that her status had not changed. Hunter decided to visit Gomes himself after the meeting, which was something he had never before done with a hunger striking inmate. (*Id.*) Hunter and Mercado visited Gomes in the medical pod that afternoon. (Dkt. 134 at ¶ 47). Hunter told Gomes he was concerned about her, he asked her to eat, and asked her if there was anything special she wanted to eat. (Dkt. 134 at ¶ 48). She did not respond. (*Id.*) After leaving Gomes' cell, Hunter asked the nurse about her condition and was told that she was medically stable and that they were continuing to take her vitals. (*Id.* at ¶ 49). The nurse also stated that if Gomes' vital signs deteriorated sufficiently, they would transport her to the hospital. (*Id.*) After the visit, Hunter requested that Mercado keep him posted on any changes in Gomes' condition. (*Id.* at ¶ 50).

On December 29, 2011, Dr. Young Kim, who had been on vacation from December 22-27, 2011, examined Gomes at approximately 11:00 a.m. Dr. Kim noted that she was lethargic, pulse was

low, blood pressure was normal, but she was severely dehydrated, had decreased skin turgor, and dry mucus membranes. (Dkt. 138 at ¶ 58). He requested an ambulance transport for Gomes to Vista East hospital due to severe dehydration and for further evaluation. (Dkt. 142 at ¶ 53). She was immediately transported to hospital. (*Id.*) Dr. Kim testified that there is no set number of days of not eating and drinking before an individual should be sent to the hospital. (Dkt. 132 at ¶ 55). The decision to send a patient to the hospital depends upon an examination of the individual involved, their condition, and a medical determination of their stability. Gomes died in Vista East hospital on January 3, 2012.

*Expert Testimony*

Plaintiff offers testimony from four experts: Ron McAndrew, correctional administration expert; Dr. James Gilligan, medical doctor and psychiatrist specializing in correctional healthcare; Joseph Harper, licensed clinical social worker; and Dr. John Raba, internist and correctional health consultant.

Ron McAndrew offers the following conclusion on the conduct of Lake County defendants. The Lake County Government, Sheriff Curran's entire correctional organization failed Gomes in their duty to give proper and required assistance to a person entrusted to their care and custody. Each of the Lake County defendants consciously ignored the serious medical and mental health needs of Gomes and her deterioration over 15 days without food or drink. McAndrew opines that the Lake County defendants failed to declare a medical emergency, coordinate or communicate with medical staff to facilitate administration of forced medication, feeding, or transfer outside the jail. McAndrew further opines regarding Curran's responsibilities as Sheriff.

Dr. James Gilligan testimony focuses on Dr. Singh. Dr. Gilligan concludes that Dr. Singh's treatment fell below the standard of care in psychiatry and that he consciously ignored Gomes' serious medical needs. Dr. Gilligan notes that Dr. Laura Murphy at Vista East hospital made the

same diagnosis upon Gomes' arrival that Dr. Singh did on December 24, 2011, five days earlier. Dr. Gilligan opines that Dr. Singh would not have needed more information than that to transfer her to the hospital.

Harper offers the following opinions on the CCS social worker defendants. Against Bibbiano, Harper opines that she failed to adequately assess Gomes, failed to adequately document her encounters with Gomes, failed or refused to seek guidance or supervision in her handling of Gomes, failed or refused to refer Gomes for adequate assessment and treatment, failed or refused to supervise or otherwise provide guidance to mental health staff, and failed to follow the CCS Hunger Strike Policy regarding an urgent determination of whether the inmate is not eating as a result of mental illness. Harper maintains that Muuru and Jones each failed to adequately assess Gomes, failed to adequately document her encounters with Gomes, failed or refused to seek guidance or supervision in her handling of Gomes, failed or refused to refer Gomes for adequate assessment and treatment, and failed to follow the CCS Hunger Strike policy regarding the requirement for an urgent determination of whether the inmate is not eating as a result of mental illness.

Dr. Raba, plaintiff's correctional medicine expert, admitted that he does not know whether the Sheriff's defendants' alleged inactions would have made any difference in outcome for Gomes. Plaintiff retained Dr. Raba to give opinions regarding the conduct of Dr. Elazegui and the CCS administration. He opines that Dr. Elazegui did not develop an appropriate treatment plan, failed to seek outside consultation, failed to monitor Gomes' liquid intake and output, failed to provide forced feeding or hydration, did not meet with correctional leadership about Gomes' care, ignored CCS' Hunger Strike Policy, concluded that she was medically stable while ignoring evidence to the contrary, and failed to provide the care and treatment she needed either at Lake County Jail or at an outside hospital, thereby delaying appropriate intervention and directly contributing to her demise.

Dr. Raba also offered opinions on the CCS administration and failure to respond to and communicate regarding Gomes' condition.

Defendants retained Jeff Eiser, jail operations expert, and Dr. Jesse Hall, internal medicine and critical care expert. Eiser's report concluded that the Lake County defendants met the standard of care for correctional officers, adhered to jail polices, and complied with the Illinois County Jail Standards. Eiser found no evidence of deliberate indifference by Curran, Hunter, or Fitch. He further found that the policies, procedures, and training were adequate and complied with the Illinois County Jail Standards. CCS medical expert Dr. Jesse Hall opined that Gomes' death was not related to any care she did or did not receive at the jail and her outcome would not likely be any different had she been hospitalized sooner.

**Legal Standard**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper where the pleadings, depositions, admissions and affidavits demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F. 3d 763, 773 (7th Cir. 2005).

**Discussion**

Plaintiff asserts that the defendants were deliberately indifferent to her mental illness when she was taken into custody on December 14, 2011. Plaintiff further asserts that her refusal to consume food and water did not constitute a voluntary hunger strike, but was symptomatic of Gomes' mental illness and she should have been transported to hospital sooner in order to prevent her death from complications due to dehydration and starvation on January 3, 2012. Among various

state law claims, plaintiff also contends that the Lake County defendants violated her rights under the Americans with Disabilities Act ("ADA") and the Vienna Convention.[3]

I.      *Lake County Defendants' Motion for Summary Judgment*

        *a. Fourteenth Amendment Due Process Claim - Deliberate Indifference to a Serious Medical Need*

The Lake County defendants argue that they are entitled to judgment as a matter of law on all claims against them because there is no evidence in the record to support that either Mark Curran, Wayne Hunter, or Scott Fitch were deliberately indifferent to Gomes' medical or mental health needs. They maintain that they reasonably relied on the judgment of the medical staff, they did not cause Gomes' death, and they are entitled to qualified immunity for their actions.

Plaintiff asserts that the Fourth Amendment objective reasonableness standard should apply because Gomes was detained on a bench warrant rather than as a pretrial detainee after a probable cause determination.[4] However, detention following an arrest pursuant to a bench warrant constitutes a judicial determination of sufficient cause to invoke the Due Process Clause of the Fourteenth Amendment. *Armstrong v. Squadrito*, 152 F.3d 564, 569-570 (7th Cir. 1998). The Due Process Clause of the Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of pretrial detainees. *Pittman v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). Pretrial detainees are entitled to reasonable medical treatment for serious medical needs, including mental health needs. *See Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998).

A plaintiff claiming a constitutional violation under 42 U.S.C. § 1983 for denial of medical care must meet both an objective and a subjective component. *Pittman*, 746 F.3d at 775. First, plaintiff must show that her medical condition was objectively serious. *Id.* Second, plaintiff must show that the defendant officials had a sufficiently culpable state of mind. *Id.* The necessary state of

---

[3] Plaintiff abandons the ADA and *Monell* allegations against the medical defendants.
[4] Plaintiff only asserts the Fourth Amendment standard for the Lake County defendants and not for the medical defendants.

mind also has two components. The official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Defendants do not dispute that Gomes' medical need was objectively serious in terms of her refusal to eat or drink, though they dispute sufficient evidence to indicate a mental illness. Thus, this Court focuses on the second element deliberate indifference.

Defendant Mark Curran was the Sheriff of Lake County at the time of Gomes' detention. It is undisputed that Curran testified that he had no personal involvement with Gomes and did not know anything about her until she was transported to hospital on December 29, 2011. The only possible contact indicated in the record is a visit that Curran made to the 5 Southeast housing pod on December 16, 2011. Gomes was housed in that pod at that time. Curran testified that he had no recollection of the visit and Gomes was not brought to his attention. The pod visit was part of routine visits to different sections of the jail. Accordingly, the record evidence does not show that Curran had the requisite state of mind for deliberate indifference.

Defendant Wayne Hunter was Deputy Chief of Administration and acting Chief of Corrections for the Lake County Jail. Hunter learned of Gomes' condition in an email on December 26, 2011. Hunter sought daily updates after learning of Gomes' condition and personally visited her in the medical pod to offer to bring her food from outside the jail. These facts negate a finding of deliberate indifference against Hunter. "Deliberate indifference is more than negligence and approaches intentional wrongdoing." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal quotation omitted).

Evidence that defendant Fitch acted with deliberate indifference is similarly lacking. Like Hunter, defendant Fitch took affirmative steps to ensure that Gomes received adequate care. It is

undisputed that defendant Fitch, who was off duty between December 21-26, 2011, first learned of Gomes' condition upon returning to duty. He consulted with the CCS Health Services Administrator, who confirmed that Gomes was under the care of medical personnel. He reviewed her medical records to verify that Gomes was medically stable and followed up with her public defender to encourage counsel to visit and expedite Gomes fitness evaluation, which was scheduled for January 5, 2012. The record evidence shows that Fitch was concerned for Gomes' health and took steps to verify her treatment. Thus, Fitch is entitled to judgment in his favor on deliberate indifference.

These defendants also reasonably relied on the medical staff to provide appropriate care. Upon arriving at the jail, Gomes was placed on suicide watch and checked every fifteen minutes. Although Hunter and Fitch have some medical or mental health training, their roles at the jail were not to provide medical care and treatment of inmates. It is undisputed that CCS was responsible for providing all medical and mental health care to detainees at the Lake County jail. The record evidence indicates that she was placed in the medical pod soon after arrival and nurses recorded her vital signs every four hours. The Seventh Circuit has held,

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Accordingly, this Court finds that the Lake County defendants' reliance on the medical staff's care of Gomes was reasonable and further establishes they were not deliberately indifferent and there is no evidence that they caused Gomes' death.

The Lake County defendants are also entitled to qualified immunity. Qualified immunity protects government officials from individual liability for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). Having found the Lake County defendants are entitled to summary judgment in their favor on the issue of deliberate indifference, this Court finds that plaintiff cannot defeat the defense of qualified immunity.

*b. Consular Notification*

Article 36 of the Vienna Convention on Consular Relations ("Vienna Convention" or Convention), governs the communication between a foreign national and her consular officers when the individual is detained by authorities. The Vienna Convention on Consular Relations, Apr. 24, 1963, [1970] 21 U.S.T. 77, 100-101, T. I. A. S. No. 6820; *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006). Plaintiff asserts that the Lake County defendants violated her rights under Article 36 of the Vienna Convention by failing to inform Gomes of her rights under the Convention to have the Indian Consulate notified of her detention in Lake County jail. The Lake County defendants argue that Article 36 does not create a direct cause of action and must be brought as a civil rights violation under section 1983. *See Jogi v. Voges*, 480 F.3d 822, 835-36 (7th Cir. 2007). Plaintiff indeed failed to assert her consular notification claim under section 1983 and thus could be rejected on that basis. Plaintiff's claim would nevertheless fail because there is no evidence connecting Gomes' death with the Lake County defendants' admitted failure to provide the notification.[5] The Lake County defendants are thus entitled to summary judgment in their favor.

---

[5] Although the Lake County defendants admit that Gomes was not notified that the Indian consulate could be contacted if she so chose, none of the named defendants were the booking officer whose duty it would have been to provide the notification and, thus, the Lake County defendants lack the requisite personal knowledge and involvement to sustain the claim under section 1983.

*c. Monell Municipal Liability*

The Lake County defendants move for summary judgment on plaintiff's municipal liability claim. Plaintiff alleges that Lake County is liable for Gomes' death because defendant Sheriff Curran was the final policymaker. Plaintiff argues that the need for more or different training with respect to consular notification, booking, communication, and medical emergency practices and procedures was so obvious that Gomes' injury was a predictable consequence of such deficient training that the municipality may also be found liable. *See Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1361 (2011).

In order to prevail on her claim of municipal liability, Gomes must prove that Curran is liable on the underlying substantive claim in order to recover damages from the County under either a failure to train or failure to implement theory. *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003). "A municipality will be held liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to deliberate indifference [on the part of final policy makers] to the rights of the individuals with whom the officers come into contact." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). Municipal liability may be imposed where the policy in question is a "moving force" behind the constitutional injury. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

Plaintiff's argument for liability based on a failure to provide consular notification rights is based on pure speculation. While it is undisputed that Lake County did not notify Gomes that she had a right under the Vienna Convention to request that the Indian consulate be informed of her detention, there is no evidence to support causation or damages. Plaintiff speculates that the Indian consulate could have played a role in convincing Gomes to eat or by convincing jail officials to send her to the hospital sooner. The record before the Court contains no evidence to indicate the Indian

consulate would have or could have done anything. Therefore, this Court must find in favor of defendants on this issue.

This Court also grants the defendants' motion with respect to municipal liability for the failure to train and implement procedures for booking, communication, and medical emergency practices. Lake County had a policy in place, but there is some question, in hindsight, as to its sufficiency. While a close call, ultimately this Court must find in favor of the Lake County defendants, first because plaintiff raises the failure to train argument for the first time in response to summary judgment, and second, because there is no evidence in the record to indicate anyone, including Sheriff Curran was aware that the communication channels and practices might be lacking. Even when viewed in the light most favorable to plaintiff, as this Court must on summary judgment, the record evidence does not create an issue of fact for municipal liability.

*d. Americans with Disabilities Act ("ADA")*

Plaintiff argues that the Lake County defendants are liable for a violation of the ADA. Plaintiff asserts that Gomes was suffering from a mental illness and the officers discriminated against her on that basis. To prevail on claim for an ADA violation, plaintiff must prove: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Indiana High Sch. Ath. Ass'n*, 181 F.3d 840, 847 (7th Cir. 1999). While there is some question as to Gomes' mental state during her detention, there simply is no evidence in the record to create a question of fact as to discrimination. This Court finds the Lake County defendants are entitled to summary judgment in their favor on this claim as well.

*e. State Law Claims*

Plaintiff also alleges claims against the Lake County defendants for wrongful death, intentional infliction of emotional distress, conspiracy, *respondeat superior* and indemnification. The

record lacks evidence to support these claims. The Lake County defendants are entitled to judgment as a matter of law on these claims.

There is simply no evidence to show that the Lake County defendants' conduct was willful and wanton conduct or that it proximately caused Gomes' death. 745 ILCS 10/4-105 (Illinois Tort Immunity Act limits the liability of public employees acting within the scope of their employment). Nor is there any evidence of extreme and outrageous conduct on the part of the Lake County defendants to support an intentional infliction of emotional distress claim. *See Feltmeier v. Feltmeier,* 207 Ill. 2d 263, 274, 798 N.E.2d 75 (2003) ("defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community"). If Gomes was subjected to extreme and outrageous conduct, then so too would nearly every detainee in Lake County jail. Gomes' distress appears to be the fact of her detention and not based on any affirmative conduct of defendants. The conspiracy claim is similarly lacking in evidentiary support. There is no evidence in the record to show an agreement to harm Gomes or any act performed in furtherance of the agreement. Additionally, this Court already found that plaintiff cannot prove the Lake County defendants deliberately denied Gomes' medical or mental health care and, thus plaintiff cannot prove the conspiracy, *respondeat superior*, and indemnification claims. The Lake County defendants are entitled to judgment as a matter of law on these claims.

Based on the foregoing, the Lake County defendants' motion for summary judgment is granted.

*II. Medical Defendants*

The medical defendants, Correct Care Solutions ("CCS"), Dr. Rozel Elazigui, Dr. Hargurmukh P. Singh, Jennifer Bibbiano, Ruth Muuru, and Edith Jones, separately move for partial

summary judgment.[6] Plaintiff has abandoned the ADA violation claim and the *Monell* municipal liability claim by not opposing summary judgment on those counts. For the reasons set forth below, this Court grants in part and denies in part the medical defendants' motion.

*a. Deliberate Indifference*

The medical defendants move for summary judgment, arguing that they were not deliberately indifferent to Gomes serious medical needs because the medical defendants repeatedly examined and assessed her and she refused treatment. This Court acknowledges that Gomes interacted with medical staff on 57 occasions over a fifteen day period. However, "[a] prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

"A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

The medical defendants rely on several cases to support the proposition that where a detainee refuses treatment she cannot complain of deliberate indifference to a serious medical need. None of those cases present anything like the situation here. In *Offutt v. Cahill-Masching*, 2007 WL 4379416, at *5 (C.D. Ill. 2007), the plaintiff had vaginal bleeding that prison medical staff deemed

---

[6] The medical defendants do not move for summary judgment on Counts XV and XVII, plaintiff's state law claims for medical negligence and *respondeat superior*.

minor, there was no indication in the record through experts or other evidence that the plaintiff had a serious medical need and thus there was no deliberate indifference. In *Grant v. O'Leary*, 1996 WL 377173, at *5 (N.D. Ill. 1996), the court found that the plaintiff's refusals to consume some meals while in solitary confinement could not sustain a deliberate indifference complaint. In *Thomas v. Gish*, 64 F.3d 323, 326 (7th Cir. 1995), the plaintiff had been found to be a malingerer in a prior suit. In *Williams v. Fishburn*, 1998 WL 748285, at *5 (N.D. Ill. 1998), the plaintiff refused to have a tooth removed, but the facts showed that he had ceased to complain of pain in the tooth and was considering whether it had to be removed at all, and therefore the court found he could not assert deliberate indifference against the dentist. In *Pritchett v. Page*, 2000 WL 1129891, at *8 (N.D. Ill. 2000), the court found that the plaintiff had failed to state a claim for deliberate indifference where he refused a tuberculosis inoculation because it did not constitute a serious medical need.

Here, factual questions abound where the medical staff attended to Gomes on 57 occasions in fifteen days, but Gomes died anyway. Putting aside the question of why Gomes remained in Lake County jail for so long on what appears to this Court to be a minor offense there is expert medical testimony from Dr. Raba that Gomes' vital signs warranted earlier intervention. The entire time that Gomes was detained in Lake County jail she did not eat and no one observed her drink any liquid, she was noted to be on a hunger strike and the jail's hunger strike policy was initiated, and yet, her weight was not recorded until her fifth day of detention. Dr. Raba points out that it was her weight on that day that Dr. Elazagui used as a baseline for determining when she had lost a sufficient percentage of weight to necessitate additional medical intervention. Dr. Raba also points to changes in her vital signs that he opines should have indicated to medical staff that Gomes was dehydrated. Gomes did not have a documented visit with a physician until December 22, 2011, eight days from her incarceration. On that date, Dr. Elazagui noted that Gomes was in the sixth day of a hunger strike. Dr. Raba opines that this miscalculation may have led Dr. Elazagui to minimize the severity

of Gomes' condition. The following day the nurse's progress notes state that Gomes had not eaten for nearly a week when she had not eaten in nine days. The progress notes from December 23, 2011, also indicate that her condition was worsening, she had lost ten pounds since December 18, 2011, and her vital signs were unstable. Among other instances, there is ample evidence in the record to raise questions of fact as to whether the medical staff simply ignored Gomes' worsening condition in a situation that even a layperson would understand to be potentially life-threatening.

Factual questions are also present on whether Gomes' mental health condition prevented her from knowingly refusing treatment. It is beyond question that Gomes had the right to refuse to speak to medical providers and to refuse to medical examination and testing. *Washington v. Harper,* 494 U.S. 210, 221-222 (1990). In this case, however, the record contains evidence that Gomes mental health was in question from her initial intake evaluation on December 14, 2011, to her court hearing on December 19, 2011, to her first visit with Dr. Singh, the jail psychiatrist on December 24, 2011. Plaintiff's experts opine that Dr. Singh's and the social workers' treatment fell so far below the standard of care that they consciously ignored her serious mental health needs. This Court finds sufficient questions of fact relating to the medical defendants care and treatment to put the question of deliberate indifference to a jury.

### b. Willful and Wanton Conduct

The medical defendants move for summary judgment on plaintiff's wrongful death claim asserting the Illinois Tort Immunity Act shields them from liability in the course of their employment unless the conduct is willful and wanton. 745 ILCS 10/1-101 *et seq.* Defendants' argument fails for the same reason that their deliberate indifference argument fails. The Seventh Circuit Court of Appeals has held that the willful and wanton standard is remarkably similar to the deliberate indifference standard." *Williams v. Rodriguez,* 509 F.3d 392, 404-05 (7th Cir. 2007). This Court denies the medical defendants' motion for summary judgment on this count.

*c. Intentional Infliction of Emotional Distress*

To prevail on the claim for intentional infliction of emotional distress ("IIED"), plaintiff must prove that: (1) the medical defendants engaged in "extreme and outrageous" conduct; (2) the medical defendants intended or recklessly disregarded the probability that the conduct would cause Gomes to suffer emotional distress; (3) Gomes endured severe or extreme emotional distress; and (4) the defendants' conduct actually and proximately caused Gomes' distress. *Ulm v. Memorial Medical Center,* 2012 IL App (4th) 110421, P39, 964 N.E.2d 632, 641 (2012). The standard for extreme and outrageous conduct is higher than what is required for deliberate indifference. *Hardy v. Hardy*, No. 10 C 5921, 2013 WL 5325077, at *3 (N.D. Ill. Sept. 20, 2013) (Durkin, J.); *Wells v. Bureau Cnty.,* 723 F.Supp.2d 1061, 1088–89 (C.D.Ill. 2010). This Court has found factual questions abound for plaintiff's deliberate indifference claim, the same is not true for the IIED claim. Particularly lacking is evidence to support the element that Gomes endured emotional distress that stemmed from the medical defendants' conduct and not from either mental illness or the simple fact of her predicament. There is simply no evidence in the record to support this claim. Thus, this Court grants summary judgment in favor of the medical defendants on this issue.

*d. Conspiracy*

Plaintiff argues that the medical defendants conspired to cover up their deliberate indifference by providing inconsistent statements to distance themselves from their contemporaneous documentation of Gomes' deteriorating condition. (Dkt. 136 at p. 17). This argument is wholly different than the allegations of conspiracy to deny medical care that plaintiff presented in the First Amended Complaint (Dkt. 35 at ¶ 124), which plaintiff now seems to have abandoned. "To be liable as a conspirator you must be a voluntary participant in a common scheme, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Jones v. City of Chicago,* 856 F.2d 985, 990 (7th Cir. 1988). In this case,

however, the medical defendants denied talking to each other about the lawsuit. Accordingly, there is no evidence to support the conspiracy claim under its new iteration. Furthermore, plaintiff's argument on this issue is undeveloped and perfunctory, and therefore waived. *See Stifel v. Lac DU Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 212 n. 73 (7th Cir. 2015) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).

Based on the foregoing discussion, the medical defendants' motion for summary judgment is granted in part and denied in part.

IT IS SO ORDERED.

Date: April 4, 2016

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge